**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

BSN Live, Inc. d/b/a DNVR and DNVR Sports  )
                                              )
             Plaintiff,                     )
                                              )
           v.                           )   Case No. 1:23-cv-00121-STV
                                              )
Bonneville International Corporation          )
                                              )
           Defendant.                  )

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff BSN Live, Inc. ("BSN" or "Plaintiff") d/b/a DNVR and DNVR Sports, through its counsel, respectfully moves for a Preliminary Injunction enjoining Defendant Bonneville International Corporation ("Bonneville" or "Defendant") from infringing Plaintiff's trademark rights in connection with sports-media fan-experience services. This Motion is made pursuant to Federal Rules of Civil Procedure Rule 65 and based upon the memorandum of law and accompanying evidence filed herewith, any further evidence and argument to be presented before or at the hearing, and all files, records, and proceedings herein.

## BSN LIVE, INC.'S BRIEF IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

Plaintiff BSN seeks to preliminarily enjoin Defendant Bonneville, from using the DENVER SPORTS wordmark and its accompanying logo, as an umbrella brand for its Colorado sports-media fan-experience content. Defendant suddenly began using the infringing wordmark and logo after using a variety of different marks for many years in an aggressive and illegal effort to profit from Plaintiff's goodwill and capture the same Colorado sports fans consumer base as Plaintiff. Plaintiff began using DNVR and the DNVR (Stylized) mark (the "Marks") as the brand

name for Plaintiff's sports-media fan-experience services as early as July 2019. Plaintiff owns a United States federal registration for "DNVR" as it is applied to sports-media fan-experience services and has also applied for federal protection of its stylized logo, which it has earned trademark rights in and built significant goodwill around over the past four years. Plaintiff seeks a preliminary injunction based upon the ongoing irreparable harm caused by Defendant's willful trademark infringement.

## LOCAL RULE 7.1 CONFERENCE

Pursuant to D.C.Colo.LCivR 7.1(a), Plaintiff's counsel has conferred with counsel for the Defendant via email and phone call regarding the subject matter of this Motion and are unable to resolve the issues without moving forward with this Motion.

## FACTS AND BACKGROUND[1]

Plaintiff BSN Live, Inc. was co-founded in 2014 by Brandon Spano and Ryan Koenigsberg. In 2019, Plaintiff filed for the Colorado state trade name DNVR SPORTS (ID No. 201916112570) and in 2020, filed for the Colorado state trade name DNVR (ID No. 20201678418), both of which are still active today. Plaintiff began using DNVR, DNVR SPORTS and the accompanying logo as the identifier for its Colorado sports-media fan-experience company in 2019. Plaintiff utilizes various platforms, including a website, social media accounts, including Twitter, Instagram, and Facebook, audiovisual platforms, including YouTube, and podcast streaming platforms, including Megaphone, Apple Podcasts, Spotify, Stitcher, Google Podcasts, and iHeart, to distribute its sports-media and fan-experience content to its consumers within

---

[1] The Facts set forth in this section are supported by the Declaration of Brandon Spano ("Spano Declaration") filed concurrently herewith, and by additional evidence and testimony to be produced at the hearing on this matter.

Colorado and throughout the world. Plaintiff produces sports media content, both written articles and live and recorded podcasts, sports-related events, and merchandise year-round. Plaintiff owns the United States federal trademark registration for DNVR in its standard character form (US Reg. No. 6769953), and the United States federal trademark applications for the stylized DNVR mark (US Serial Nos. 97388621 and 97388647). An example of the logo is below:



Over the past four years, Plaintiff has developed a substantial fan base with over 13,900 fans on Instagram, over 15,000 followers on Facebook, a Twitter following that exceeds 21,000 fans, and over 31,200 subscribers on its DNVR SPORTS YouTube channel. *See* Dkt. Nos. 2-4, 2-5, 2-6, Exhibits E-G; Dkt. No. 3, Exhibit H. As exhibited, Plaintiff uses the above logo and DNVR word mark and DNVR SPORTS word mark on all its social media platforms, on its website, on its YouTube channel and on various merchandise sold by the company to its substantial fan base. Plaintiff continues to grow steadily and has expanded into other markets across the nation, including Phoenix, Arizona and Chicago, Illinois. With a daily outpouring of content including podcasts, twitter posts, Instagram posts, news articles and merchandise sales, all at the pace of a fast-moving sports news media company, the followers of the Plaintiff have come to recognize and know the DNVR brand and logo. The fan base sees the brand on varying levels of the fan-experience making the brand saturation a 360 experience for the fans. The consumers have also come to associate the brand with the Plaintiff's sports media content presentation method. The Plaintiff's presentation of sports media content is in line with their motto of "we make it more fun to be a fan" and lean on positive engagement with Colorado sports fans. Over the past four years

the brand has built a community that supports the Colorado sports teams and gains their knowledge of the teams and the athletes playing on those teams through the Plaintiff's various media platforms. Further in support of the Plaintiff's sports-media fan-experience services, Plaintiff opened a bar-restaurant March 13, 2020 with the logo and brand displayed on the exterior of the restaurant and all over the interior of the bar and on the menu as seen on their website. *See* Declaration of Jessie Pellant (hereafter "Pellant Dec."), Exhibit AC. The company also provides tailgating experiences for fans at various sporting events around the city using their brand. *Id.* Further, the Plaintiff provides the Locker which sells merchandise supporting the Colorado sports teams, allowing the consumers of Colorado sports media to expand their fan experience to a multifaceted approach to fandom, and this portion of the website is also connected to the DNVR and DNVR SPORTS brand name. *Id.* The recognition of the DNVR brand has surpassed a local following with the national presence of the parent company of DNVR and is becoming a nationally recognized brand for the fans of the Colorado sports community.

On January 3, 2023, Defendant Bonneville, a Salt Lake City company, announced the brand name "DENVER SPORTS" to act as the new umbrella brand of its sports-media fan-experience services. *See* Dkt. No. 3-1, Exhibit I. This includes local radio stations, such as Denver's Sports Station 104.3 The Fan (KKFN-FM), ESPN Denver 1600 (KEPN-AM and 104.3 HD2), and 104.3 HD3, as well as other media outlets, like DenverSports.com, Coffee Break digital video show, Orange and Blue Today digital video show, Mile High Hoops podcast, and Mile High Hockey podcast. *Id.* On January 3, 2023, Defendant also revealed the accompanying DENVER SPORTS logo, consisting of the DENVER SPORTS wordmark in white block letters on a black background to the right of a simple white graphic which depicts the rocky mountain skyline. *Id.*

An example of the logo is below:



    Immediately following the announcement, fans of both Plaintiff and Defendant's 104.3 The Fan, expressed confusion between the use of DENVER SPORTS and DNVR and DNVR SPORTS and the accompanying logos. *See* Dkt. No. 3-2, Exhibit J. Some consumers believed the two entities merged or that Plaintiff rebranded its own DNVR Sports logo, while others commented on their own incidences of confusion between the two entities' marks. *Id.*; Pellant Dec., Exhibit AB.  A sample of the comments are listed below:





*See* Dkt. No. 3-2, Exhibit J; Dkt. Nos. 4-4, 4-5, Exhibits V-W.

There are fans of both Plaintiff and Defendant who have exhibited confusion. *See* Pellant Dec., Exhibit AB. There are fans of the Defendant who have posted comments on the Plaintiff's content mistakenly, confusingly identifying the incorrect media company for the content, and likewise, fans of the Plaintiff who have posted on Defendant's media content mistaking the Plaintiff as the source of content. *Id*. The actual confusion of the source of the content put out into the marketplace is substantial for companies who have shared brand existence for only 16 days. To have consumers confusing the source of the sports media content they are receiving is of grave concern for Plaintiff. Prior to January 3, 2023, Defendant's 104.3 The Fan fostered a brand-image among Colorado sports fans that featured incendiary social media posts and headlines acting as "clickbait." As called out by fans on the radio station's Twitter account, the voice and connotation of the posts are designed to trigger fan (i.e., consumer) interaction by evoking anger and

controversy, rather than engage positively with DENVER SPORTS. *See* Dkt. No. 3-4, Exhibit L.

A sample of the comments are listed below:





In contrast, as previously mentioned Plaintiff's motto is "we make it more fun to be a fan" and has established its goodwill and reputation on positive fan engagement, as opposed to divisiveness and controversy to drive consumer engagement. Plaintiff and Defendant compete in the same market for the attention and engagement of Colorado sports fans, but they differ markedly in their respective approaches to content. Without the ability to assert quality control over Defendant's content associated with its brand and the inability to redirect sports fans at the moment of confusion, Plaintiff has been forced into legal action to protect its brand. Plaintiff has built a reputation as the content provider that makes it "more fun to be a fan" and is now being associated—illegally and against its will—with Defendant's negative platform due to Defendant's infringement. Irreparable harm to Plaintiff's reputation and goodwill is thus both clear and imminent.

Even more disheartening is that Defendant made their brand choice deliberately with access, knowledge, and awareness of the extent of the DNVR and DNVR SPORTS brand, the logo and their sports media offerings. Mr. Spano, Plaintiff's co-founder and Chief Executive Officer, was given his start in the Colorado sports media industry in 2009 by James Merilatt, the current Director of Digital Content at Defendant's 104.3 KKFN The Fan / ESPN Radio 1600. *See* Dkt. No. 4-8, Exhibit Z. In June 2013, Mr. Spano was hired by 104.3 KKFN The Fan / ESPN Radio 1600 to run a weekend radio show and sell brand partnerships to be discussed during the show. *Id.* Mr. Spano left 104.3 KKFN The Fan / ESPN Radio 1600 before co-founding Plaintiff in June 2014. *Id.* Since 2014, Plaintiff has become a leader in Colorado's sports media fan experience industry, among other similar entities such as Altitude Sports, Mile High Sports, The Denver Post, and 104.3 KKFN The Fan / ESPN Radio 1600. *Id.* Plaintiff has employed individuals who have

made a direct transition to some of the other entities, including 104.3 KKFN The Fan / ESPN Radio 1600. Notably, Plaintiff's former Denver Broncos writer transitioned to 104.3 KKFN The Fan / ESPN Radio 1600 in May 2022. *Id.* 104.3 The Fan wrote and published an article evidencing the move, stating: "'Mase' as he's known to Broncos Country, joins The Fan from DNVR where he provided written and audio analysis of the Broncos since 2019". The article was shared on Twitter by Defendant's Raj Sharan, Program Director of 104.3 KKFN The Fan / ESPN Radio 1600, evidencing Defendant's direct knowledge of the DNVR brand. *Id.*

In light of the extensive trademark rights Plaintiff has built in the DNVR brand, actual confusion since the launch of DENVER SPORTS on January 3, 2023 and the overlap of the two entities in the Colorado sports-media fan-experience industry, Plaintiff sent a letter to Defendant evidencing the confusion among the fan base and requesting Defendant to cease and desist from using DENVER SPORTS and the corresponding logo on January 6, 2023. Defendant declined to comply with Plaintiff's request. In the days following, further evidence of confusion continued to accumulate on social media. The continued confusion in the marketplace left Plaintiff with no choice but to file a Complaint, which was filed January 17, 2023. During the meet and confer on December 18, 2023 for this Motion Defendant requested 24 hours to formally respond to Plaintiff and in that time replied and state they will not make changes to their brand. Plaintiff is facing actual, documented, and imminent harm as the two brands are continuing to be confused in the marketplace and will continue to do as long as Defendant's infringement is allowed to persist. *See* Pellant Dec., Exhibit AB.

## ARGUMENT

The purpose of a preliminary injunction is to preserve the status quo until a trial on the merits can be held. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005); *Archer v. Griswold*, No. 1:22-cv-02304-NYW-KLM, 2022 U.S. Dist. LEXIS 199784, at *13 (D. Colo. Nov. 2, 2022). The "status quo" is the last uncontested peaceable status between the parties. *Id.* at 1260. In the instant case, the last peaceable uncontested status existed between the Parties prior to Defendant's introduction of the DENVER SPORTS wordmark and logo on or around January 3, 2023.

"To obtain a preliminary injunction, the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009); *Chapman v. Lampert*, 555 F. App'x 758, 762 (10th Cir. 2014); *Zachary v. Englebird*, No. 21-cv-02129-PAB-KLM, 2023 U.S. Dist. LEXIS 2920 (D. Colo. Jan. 6, 2023). Plaintiff meets each of these elements and is entitled to a preliminary injunction.

## I.    LIKELIHOOD OF SUCCESS ON THE MERITS

In determining the movant's likelihood of success on the merits, the court asks whether the movant has a "fair chance of prevailing," not whether the movant has proven "a greater than fifty percent likelihood [it] will prevail on the merits." *Phelps-Roper v. Nixon,* 509 F.3d 480, 484 (8th Cir. 2007). The Lanham Act authorizes courts to grant injunctions "according to principles of equity." *Park 'n Fly v. Dollar Park & Fly*, 469 U.S. 189, 202–03, 105 S. Ct. 658, 666 (1985); 15 U.S.C. §§ 1116(a), 1117.

### A.     TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

Pursuant to the Lanham Act, 15 U.S.C. § 1125(a), one may not, without consent, use in commerce any word, term, name, symbol, or device, or any combination thereof in connection with the sale, offering for sale, distribution, or advertising of any goods or services when such use is likely to cause confusion, or to cause mistake, or to deceive.

Colorado law allows for common law trademark infringement and unfair competition claims in addition to federal Lanham Act claims. C.R.S. § 7-70-103. Colorado common law trademark and unfair competition claims are similar to federal trademark and unfair competition claims. *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004) ("The elements of common law trademark or service mark infringement are similar to those required to prove unfair competition under § 43(a) of the Lanham Act"); *see also Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, (FAIR)*, 527 F.3d 1045, 1050-52 (10th Cir. 2008) ("Courts addressing claims of both trademark infringement and unfair competition, address the claims together because they have virtually identical elements"); 15 U.S.C. § 1125(a).

To prevail in an action for trademark infringement and unfair competition under 15 U.S.C. § 1125(a) and C.R.S. 7-70-103, a plaintiff must establish 1) the plaintiff's marks are protectable; 2) the defendant used a mark in connection with goods or services; and 3) the defendant's use of an identical or similar mark is likely to cause consumer confusion. *Donchez*, 392 F.3d at 1215; *Otter Prods., LLC v. Triplenet Pricing Inc.*, 572 F. Supp. 3d 1066, 1073 (D. Colo. 2021). For both trademark infringement and unfair competition analyses, the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks. *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998); *HealthOne of Denver, Inc. v. UnitedHealth*

*Group, Inc.*, 805 F. Supp. 2d 1115, 1124 (D. Colo. 2011). To determine if a "likelihood of confusion" exists, the Tenth Circuit often looks to six factors: 1) the degree of similarity between the marks; 2) the intent of the alleged infringer in adopting its mark; 3) evidence of actual confusion; (4) the relation in use and the manner of marketing between the goods or services; 5) the degree of care likely to be exercised by purchasers; and 6) the strength or weakness of the marks. *King of the Mt. Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089-90 (10th Cir. 1999). The court must consider these factors as an interrelated whole because the list of factors is not exhaustive, and no single factor is dispositive. *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 833 (10th Cir. 2005); *see also Water Pik, Inc. v. Med-Systems, Inc.*, 848 F. Supp. 2d 1262, 1271 (D. Colo. 2012).

**Trademark Rights**

As stated in the factual section and evidenced substantially with the Complaint and its accompanying Exhibits, Plaintiff uses the Marks DNVR, DNVR SPORTS and the accompanying logos in connection with its sports-media fan-experience services and the Marks are recognized by its substantial fan base and the Colorado Sports community. The Marks have been in continuous use since 2019 and on a wide variety of media platforms, for a sports-bar and restaurant and various sports related events and merchandise. The Plaintiff uses the Marks as its trademarks and is seeking principal federal registration of all of the Marks. The substantial and continual use of the Marks for all the Plaintiff's services and merchandise have earned the company significant rights in the Marks in the sports-media fan-experience community for Colorado sports fans. As exhibited in the Complaint, Defendant has initialized use of DENVER SPORTS and an accompanying logo for its sports media umbrella brand, and the marks are substantially similar.

### 1.    Similarity of the Marks

The degree of similarity between the marks is the "most important factor." *King of the Mt. Sports*, 185 F.3d at 1091; *see also Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014). Similarities in the marks receive more weight than the differences and are gauged based on sight, sound, and meaning. *Hornady*, 746 F.3d at 1001. The marks are evaluated as a whole, and as they are encountered by consumers in the marketplace based on consumer recollection. *Id*. If the services or goods are closely related, then a lower degree of similarity between the marks is required to find a likelihood of confusion. *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019).

The wordmarks are nearly identical in sound, appearance, and commercial impression. Plaintiff's wordmarks are DNVR and DNVR SPORTS, implying the sound of "Denver". Defendant's wordmark is DENVER SPORTS. The two wordmarks DNVR SPORTS and DENVER SPORTS are identical in sound. The two marks are nearly identical in appearance, with a difference of two letters.  When encountered in the marketplace alongside the service offerings, the marks have identical commercial impressions – to provide sports-media fan- experience content.

Likewise, the logos are nearly identical in sound, appearance, and commercial impression. Plaintiff's logo uses a black and white color scheme, consisting of a simple white graphic depicting the skyline to the left of the DNVR mark in white block letters, all displayed against a black background. Defendant's DENVER SPORTS brand uses a black and white color scheme, consisting of a simple white graphic depicting the skyline to the left of the DENVER SPORTS

mark in white block letters, all displayed against a black background. Use of the marks in commerce are provided in Dkt. No. 4, Exhibit R.

   

When encountered in social media as a stacked logo the marks are nearly identical as well. *See* Pellant Dec., Exhibit AB. The black and white logo atop of the word marks that are nearly identical in appearance and are identical in sound.

   

The marks, when evaluated in their entireties and in the eyes of the consumers are nearly identical, which has proven to be a source of confusion for consumers. *See* Dkt. No. 3-2, Exhibit J; Dkt. No. 4-4, Exhibit V; Pellant Dec., Exhibit AB. Further, the marks at-issue are used in connection with services and goods that are identical in nature: media content, including radio programming, social media, articles, and podcasts catering to Colorado sports fans.

**2.    Intent**

An inquiry into a defendant's intent is relevant given that some alleged infringers adopt a similar mark *hoping* consumers will be confused and thereby mistakenly give their business to the defendant company. *Cent. Bancorp, Inc. v. Cent. Bancompany, Inc.*, 385 F. Supp. 3d 1122, 1140 (D. Colo. 2019); *see also* 4 McCarthy § 23:110 ("if defendant intended confusion, this tends to show confusion of customers in fact"). Alleged intent is measured at the time the infringer "chose" or "adopted" the mark at issue. *Hornady*, 746 F.3d at 1004. Evidence of intentionally diverting internet traffic can be evidence of intent. *See, e.g., Planned Parenthood Fed'n of Am., Inc.,* 1997 U.S. Dist. LEXIS 3338, 1997 WL 133313, at *3; *see also Utah Lighthouse Ministry*, 527 F.3d at 1055. A corporation may also be liable for the knowledge of its agents and employees acting within the scope of their authority. *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 n.9 (10th Cir. 2018); *Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.,* 989 F.3d 747, 792 (10th Cir. 2021); *W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1276 (10th Cir. 2005).

Further, if a defendant is notified of its infringement and continues use of the service mark after such notice, defendant's conduct may constitute willful infringement. *Takecare Corporation v. Takecare of Oklahoma, Inc.*, 889 F.2d 955 (10th Cir. 1989). To claim willful infringement, "a

plaintiff must ordinarily show that the defendant intended to benefit from the goodwill or reputation of the trademark holder." *W. Diversified*, 427 F.3d at 1269; *see also Klein-Becker USA, Ltd. Liab. Co. v. Englert*, 711 F.3d 1153, 1162 (10th Cir. 2013). Damages of attorneys' fees may be sought for willful conduct. 15 U.S.C. § 1117; *VIP Foods, Inc., v. Vulcan Pet, Inc.*, 675 F.2d 1106 (10th Cir. 1982).

Defendant deliberately adopted the DENVER SPORTS wordmark and logo with knowledge of the DNVR Marks. Defendant at the time of the launch of the DENVER SPORTS brand had knowledge of Plaintiff via its employees and continued such adoption of the DENVER SPORTS brand and logo after notice of infringement by Plaintiff. Prior to January 3, 2023 announcement of the DENVER SPORTS umbrella brand, in 2016, Defendant applied for federal and state trademark registration of the wordmark COLORADO SPORTS in connection with apparel, advertising and marketing services, and broadcasting of radio programs. *See* Pellant Dec.**,** Exhibit AA. Specimens of use filed with the federal application show use of the COLORADO SPORTS mark on a website using the URL <www.1043thefan.com> in connection with sports media content regarding the Denver Broncos, as well as on a billboard highlighting the <1043thefan.com> site. *Id*. 104.3 The Fan is still one of Defendant's prominent sports media outlets. The COLORADO SPORTS mark when used in commerce was depicted as a red, black, and white mark, with bold italicized words. *Id*. This mark is in congruence with other Defendant entities, including Arizona Sports, Seattle Sports, and SacTown Sports (for Sacramento, CA). *Id*. Examples of the marks are below:

 

 

However, Defendant abandoned the federal trademark application in 2017 and the Colorado state trademark application in 2021. If Defendant had maintained use of the COLORADO SPORTS trademark, particularly in its red, white, and black design, the umbrella brand would have matched the rest of the Defendant portfolio. Instead, Defendant rebranded to DENVER SPORTS, *after* Plaintiff had been in operation for several years, and omits any red in the design, identifying itself almost identically with DNVR SPORTS and effectively infringing upon Plaintiff's Marks.

Furthermore, Defendant was aware of Plaintiff and its DNVR and DNVR SPORTS brand through various employees' own knowledge of Plaintiff's brand. Raj Sharan, employed by Defendant and the current general manager of DENVER SPORTS, was aware of DNVR and DNVR's branding prior to the launch of DENVER SPORTS on January 3, 2023. Raj Sharan congratulated Andrew Mason who joined 104.3 The Fan, now under the umbrella of Defendant and DENVER SPORTS, on May 16, 2022, as a senior Broncos writer after working for Plaintiff under the DNVR brand since 2019. *See* Dkt. No. 4-6, Exhibit X. Andrew Mason, after working for DNVR for three years, was aware of the DNVR branding prior to working under Defendant for DENVER SPORTS. *Id*. The employee of DENVER SPORTS, Rachel Vigil, discussed DNVR branding and services with a Denver sports fan on Twitter prior to the launch of DENVER

SPORTS. *See* Dkt. No. 4-7, Exhibit Y. This was acceptable business conduct until Defendant deliberately began trading off the goodwill of the DNVR brand. Lastly, James Merilatt, Director of Digital Content at 104.3 The Fan / ESPN Radio 1600 knew of Mr. Spano after he hired him in 2009 at Mile High Sports. Since then, both have been employed at various sports media outlets in Denver, including 104.3 The Fan. *See* Dkt. No. 4-8, Exhibit Z.

On January 6, 2023, Plaintiff sent a letter to Defendant evidencing the extensive amount of actual confusion among the fan base and requesting Defendant cease and desist from using DENVER SPORTS and the corresponding logo. *See* Dkt. No. 4-2, Exhibit T. Defendant responded to Plaintiff and declined to comply with the cease-and-desist request. *See* Dkt. No. 4-3, Exhibit U. As of the time of this filing, Defendant continues to use the DENVER SPORTS mark in commerce in connection with sports-media fan-experience services. Such conduct constitutes willful infringement, compounded by the confusion that has continued to arise on social media since January 6, 2023. *See* Pellant Dec., Exhibit AB; Dkt. No. 4-4, Exhibit V. Defendant intentionally misappropriated Plaintiff's trademarks to the detriment of Plaintiff's goodwill in its Marks and reputation without regard to the confusion it has caused among consumers, even within its own fan base.

### 3.    Actual Confusion

The best evidence of likelihood of confusion in the marketplace is evidence of actual confusion. *Utah Lighthouse Ministry*, 527 F.3d at 1055; *Standard Oil Co. v. Standard Oil Co.,* 252 F.2d 65, 74 (10th Cir. 1958). "[I]t makes no difference that some of the confusion has been among non-customers." *Cent. Bancorp*, 385 F. Supp. 3d at 1142; *see also* 4 *McCarthy* § 23:5 ("[d]amage to  reputation  and  goodwill  can  be  triggered  by confusion among  non-purchasers.  .  .,

actionable confusion need not be limited to potential purchasers whose confusion could cause a direct loss of sales."). In *Cent. Bancorp, Inc.*, the court found eight instances of actual confusion in a relatively "small" operation sufficient to support a finding of actual confusion. 385 F. Supp. 3d at 1142.

In its January 6, 2023, cease-and-desist letter, Plaintiff provided Defendant 38 pages evidencing confusion among consumers, prospective consumers, and non-purchasers. Plaintiff offered an additional 33 pages of confusion to the Court with its Complaint, and now has included Exhibit AB which also includes further evidence of actual confusion among consumers between the two brands. As previously mentioned herein, some consumers clicked on the article believing it was the other company, while others believed the two entities had merged, other consumers have provided accolades to Plaintiff or Defendant when the article or post was actually put out by the opposite company. Here are several examples:











*See* Dkt. No. 3-2, Exhibit J; Dkt. Nos. 4-4, 4-5, Exhibits V-W. These comments and this amount of confusion is occurring even though both companies have only existed in the marketplace for a mere 16 days. The saturation of confusion is palpable and sure to grow significantly if the infringement is allowed to continue. The facts of this case and the amount of confusion in such a short amount of time as compared the year or longer co-existence of competing marks in other case law finding only 8 instances of confusion necessary to award a preliminary injunction favor the granting of the injunction in this case. *Compare Cent. Bancorp*, 385 F. Supp. 3d at 1142. The comments demonstrate clear, palpable, current, and ongoing confusion within the relevant customer base and thus epitomize trademark infringement and a need for an injunction. *Utah Lighthouse Ministry*, 527 F.3d at 1045.

4.     **Similarity of the Services and Marketing Channels**

Evaluating the use of the marks in commerce through their relevant services and marketing channels also provides insight into the likelihood of confusion. *Cent. Bancorp*, 385 F. Supp. 3d at 1142; *King of the Mt. Sports*, 185 F.3d at 1089. Goods and services are similar if they are found by the consumer in "similar situations and used by customers in similar markets." *Big O Tires, Inc. v. Bigfoot 4x4, Inc.*, 167 F. Supp. 2d 1216, 1224 (D. Colo. 2001). In *Beer Nuts*, the Tenth Circuit court reversed the district court's decision, finding that it failed to give the similarities in marketing proper weight. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 926 (10th Cir. 1986); *Big O Tires*, 167 F. Supp. 2d at 1224. "The virtual identity of the products and marketing methods adds strength to the position that the products are likely to be confused." *Id*. For example, the court in *Cent. Bancorp* found that both parties provided "substantially similar" banking services which supported a finding of likelihood of confusion. 385 F. Supp. 3d at 1142, 1147

(plaintiff's motion for a preliminary injunction was granted). Typically, "the greater the similarity between the products and services, the greater the likelihood of confusion." *King of the Mt. Sports*, 185 F.3d at 1092; *Cent. Bancorp*, 385 F. Supp. 3d at 1142.

Here, Plaintiff produces several sports related podcasts, creates social media and news articles surrounding Colorado sports teams, has a sports bar named DNVR in the Denver metro area, has several podcasts and live stream sports media shows, hosts tailgates and other watch parties for Colorado sports teams, and sells merchandise, among other services. Plaintiff is based in Denver, Colorado and the content branded under the DNVR and DNVR SPORTS umbrella is all about Colorado sports teams and directed to the Colorado sports fan base.

Similarly, Defendant also produces a variety of sports-media fan-experience content directed towards the Colorado sports fan. Prior to January 3, 2023, Defendant hosted this content on the following local media outlets:

- Denver's Sports Station 104.3 The Fan (KKFN-FM)

- ESPN Denver 1600 (KEPN-AM and 104.3 HD2) and 104.3 HD3

- 1043thefan.com

- Coffee Break digital video show

- Orange and Blue Today digital video show

- Mile High Hoops podcast

- Mile High Hockey podcast

*See* Dkt. No. 3-1, Exhibit I. As of the January 3, 2023 announcement, these outlets are now under the infringing DENVER SPORTS umbrella brand and its accompanying logo. Notably, the <1043thefan.com> website is now hosted under the domain, <denversports.com>.

Both Plaintiff and Defendant produce sports media content for the Colorado sports fan, through a variety of online channels including their respective websites, the same common social media platforms (Twitter, Instagram, and Facebook), and podcast streaming sites (such as YouTube, Spotify, Apple Podcasts, and more) and market their services through the same online channels. *See* Dkt. No. 4, Exhibit R. Therefore, the services are highly related and are found by consumers in similar situations within the context of Colorado sports.

### 5.    Degree of Care of Prospective Consumers

The fifth factor is the degree of care typically exercised by consumers of the products or services linked to the trademark. *Utah Lighthouse Ministry*, 527 F.3d at 1056. Consumers typically exercise little care in the selection of inexpensive items that may be purchased on impulse. *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 975 (10th Cir. 2002). Items purchased on impulse are more likely to be confused than expensive items, which are typically chosen carefully. *Id.* The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase. *Id.*

Here, the relevant consumer is the Colorado sports fan. In today's fast-paced, content-rich environment, the Internet, and especially Twitter, multiply the amount of information available at low cost to the public from a variety of sources within any given minute. Colorado is home to five major professional teams, several semi-professional teams, and at least two prominent college sports programs. For a consumer to take in this amount of news requires quick decisions on which headlines and captions to read. Thus, in the context of Plaintiff and Defendant's content, platforms, and consumers (actual and prospective alike), the likelihood of confusion is high. Content is posted next to small replicas of the branded logo and if the marks are nearly identical and utilize the same colors, consumers are likely to be confused when digesting content at such a fast pace. As

consumer scroll through media content on their phones and websites the amount of time taken to digest the content is also at a fast pace and without significant diligence in clarifying the producing media entity. It is likely that Colorado sports fans will subscribe and review content that is put out by both entities, and if the consumer is moving at a quick pace and the logos are undecipherable at that quick scroll rate, the consumer is likely to confuse the source of the content. Again not allowing Plaintiff to be in control of their brand and the content associated with their brand, which is the cornerstone of trademark law.

###    6.    Strength of the Marks

The strength of a mark typically consists of i) the conceptual strength – the placement of the mark along the distinctiveness spectrum, and ii) the commercial strength – the marketplace recognition value of the mark. *Utah Lighthouse Ministry*, 527 F.3d at 1056. The stronger the mark, the greater the likelihood of confusion. Yet, courts have found marks with low conceptual strength to nonetheless have high commercial strength and brand recognition. *Cent. Bancorp*, 385 F. Supp. 3d at 1143 (the Court issued a preliminary injunction regardless of low conceptual strength). In terms of strength, a federally registered mark is superior to any confusingly similar mark subsequently adopted anywhere in the United States. *First Sav. Bank, F.S.B. v. First Bank Sys.*, 101 F.3d 645, 651 (10th Cir. 1996).

The commercial strength of Plaintiff's Marks is well established. Given the saturated and well-defined market of the Colorado-specific sports media industry, the length of time Plaintiff has provided content under the DNVR and DNVR SPORTS brands, and the now national presence of Plaintiff, the federally registered DNVR mark is a strong mark, superior to Defendant's DENVER SPORTS mark. Plaintiff has priority in its Marks that have come to be recognized as a

strong sports media brand supporting the Colorado sports fan community. As between Plaintiff and Defendant, ownership of the trademarks is not a legitimate subject of dispute—the Marks belong to Plaintiff. Plaintiff 's DNVR wordmark is suggestive of the location of the company, but not of its services and products. The removal of vowels add an element of creativity and differentiate the Marks from the location and provide further distinction to the Marks. The logos were created as an acknowledgement and creative take on the location of the sports teams but does not signify sports, or any media services and has a self-identifying look and feel that is unlike any other logo used in the sports industry. Plaintiff established strong common law rights in its DNVR logo and DNVR SPORTS mark through its continuous and significant use across all its services and products over the past 4 years allowing the Marks to gain significant secondary meaning.

The issue here is not whether the services or the consumers overlap—they obviously do, as demonstrated by the cacophony of customer confusion since Defendant began infringing on January 3. Rather, the issue is whether there is sufficient evidence to satisfy that there is a likelihood of confusion between these two brands going forward. The volume of fans who have already mistaken one entity over the other or inquired as to a change of ownership in the short time since Defendant began infringing reveals that actual customer confusion is a significant problem that will persist unless remedied.

In sum, each likelihood-of-confusion factor provides a lens through which the Court can evaluate whether confusion is, indeed, likely. Here, each factor—each lens—points unequivocally to an overwhelming likelihood of confusion: the marks are strikingly similar; Defendant intentionally adopted the infringing marks to look like Plaintiff's; consumers who have already interacted with the marks are consistently voicing actual confusion; Plaintiff and Defendant cater

to the same consumer base and offer the same types of content; consumers in the relevant market chose content quickly, often impulsively; and Plaintiff's marks are strong and well-established among the consumer base. Without any affiliation to one another and no way to monitor reputational control or quality of content and services, it is unjust to ask Plaintiff, who established its brand years prior to Defendant, to simply stand on the sidelines and watch Defendant attempt to ride the coattails of the goodwill Plaintiff has built up in the DNVR sports media fan experience network. Rather, Defendant must create its own path and forge ahead with a brand of its own creation, distinguishable from Plaintiff, in this Colorado sports media industry.

## II.    IRREPARABLE HARM

Courts have recognized that it is "virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement." *Gen. Steel Domestic Sales v. Chumley*, No. 10-cv-01398-PAB-KLM, 2013 U.S. Dist. LEXIS 64932, at *48-50 (D. Colo. May 7, 2013); *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126 (4th Cir. 2011). Thus, for irreparable injury, the plaintiff must prove a significant risk of harm that couldn't be compensated after the fact. *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018). The following factors may be considered: i) the difficulty in calculating damages, ii) the loss of a unique product, and iii) the existence of intangible harms, such as loss of goodwill or competitive market position. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004); *Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll.*, 23 F.4th 1262, 1270-71 (10th Cir. 2022). Similarly, the court in the *SEBO* case found that the plaintiff would likely suffer irreparable injury incapable of being remedied by money damages if the defendant was not enjoined from using the plaintiff's trademarks and selling

plaintiff's products without plaintiff's authorization. *SEBO Am., LLC v. Euraco Grp. Ltd.*, Civil Action No. 19-cv-0540-WJM-NRN, 2019 U.S. Dist. LEXIS 105393, at *7 (D. Colo. June 24, 2019); *see also Dalkita, Inc. v. Distilling Craft, LLC*, 356 F. Supp. 3d 1125, 1134 (D. Colo. 2018) (loss of control over business reputation and damage to goodwill are cognizable irreparable harms in the trademark infringement context).

As has been established herein, Plaintiff owns trademark rights to DNVR and has established strong common law rights in the DNVR logos and DNVR SPORTS. Within the past two weeks, Defendant has deceived and confused consumers as to the source of the sports-media fan-experience services associated with the trademarks, injuring Plaintiff's rights and goodwill in its trademarks. But for Defendant's actions, Plaintiff's trademarks would not have been infringed upon, Plaintiff's consumers would not have been deceived and actually confused as to the source of the services, and Plaintiff's reputation and goodwill in its trademarks would not have been injured. Nevertheless, Plaintiff is unable to accurately calculate the damage its rights and goodwill have incurred thus far and will continue to incur while the DENVER SPORTS brand is in the marketplace.

## III.    BALANCE OF EQUITIES

When determining whether to grant a preliminary injunction, courts often balance the circumstances surrounding the creation and adoption of the similar marks, the investment that has occurred, as well as the implications of a required change. The court in *Cent. Bancorp* considered other factors such as the investment plaintiff had already made in itself against the costs required for the defendant to change its name, how recent defendant adopted the name, whether the defendant had previously operated under a different name, and whether the defendant expected to

encounter similar marks in the marketplace. 385 F. Supp. 3d at 1145-1146 ("the new bank branch was less than a year old, so the cost of requiring a different name was less and weighed in favor of granting the injunction"). In *Medtronic, Inc. v. Telectronics, Inc.*, the court balanced the hardship imposed on the defendant if the injunction were to issue and the hardship imposed on the plaintiff if it should be denied. 686 F. Supp. 838, 846 (D. Colo. 1987). Nevertheless, courts have held that a defendant who "openly and intentionally appropriates a plaintiff's marks can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself." *General Motos*, 500 F.3d at 1229.

Prior to January 3, 2023, Defendant operated its sports media fan experience services under a variety of names, the most prominent being 104.3 The Fan and ESPN Denver 1600, before bringing them under the DENVER SPORTS umbrella brand. In fact, Defendant still utilizes these names in the marketplace for the respective radio stations. *See* Dkt. No. 3-1, Exhibit I; Dkt. No. 4-8, Exhibit Z, page 11.

As previously discussed, in 2016, Defendant applied for federal trademark registration and Colorado state trademark registration for the wordmark COLORADO SPORTS in connection with apparel, advertising and marketing services, and broadcasting of radio programs. *See* Pellant Dec., Exhibit AA. The specimens of use show the mark in commerce on a website using the URL <www.1043thefan.com> in connection with sports media content regarding the Denver Broncos, as well as on a billboard highlighting the <1043thefan.com> site. *Id*. The COLORADO SPORTS mark, although filed as a standard character mark, is depicted in the specimens as a red, black, and white mark, with bold italicized words. *Id*. This mark matches the other Defendant entities, including Arizona Sports, Seattle Sports, and SacTown Sports (for Sacramento, CA). *Id*. However,

Defendant abandoned the federal trademark application in 2017 and the Colorado state trademark application in 2021. If Defendant had maintained use of the COLORADO SPORTS trademark, particularly in its red, white, and black design, the umbrella brand would have matched the rest of the Defendant portfolio. Instead, Defendant deliberately chose to rebrand to DENVER SPORTS and omit any red in the design, openly and intentionally misappropriating Plaintiff's trademarks to the detriment of Plaintiff's goodwill in its marks and reputation. Defendant has only been using DENVER SPORTS in the marketplace using this new branding for the past 16 days, and has created a multitude of confusion while exhibiting this new branding. Plaintiff has priority in its Marks, and has built goodwill and a strong reputation over the past 4 years. Defendant can easily pivot from this new accepted brand and should not be allowed to ride on the goodwill and reputation of a company built over the past 4 years with such time, money and such strong dedication to the Colorado sports community.

Defendant, through its employees and its placement within the Colorado sports- media fan-experience industry, knew that Plaintiff utilized the DNVR and DNVR Sports marks in connection with sports media fan experience services prior to the announcement of the DENVER SPORTS wordmark and logo. *See* Dkt. Nos. 4-6, 4-7, 4-8, Exhibits X-Z. Defendant also had the opportunity to utilize a mark similar to its other Defendant sports media entities, and yet it chose to abandon that mark. Weighed against the substantial competitive harm and loss of goodwill that Plaintiff has experienced within the past two weeks, Defendant's commercial interests should not be considered. Defendant is deliberately riding the goodwill of Plaintiff and will not be harmed by the issuance of an injunction against it.

## IV.    PUBLIC INTEREST

Congress determined that "a sound public policy requires that trademarks should receive nationally the greatest protection that can be given them." *Park 'n Fly*, 469 U.S. at 193. National trademark protection assures the mark owner the goodwill of his business and provides consumers the ability to distinguish among competing products in the marketplace. *Id.* at 198. It benefits the consumer by preventing confusion about the source of products, and by instilling in consumers "the confidence that inferior goods are not being passed off by use of a familiar trademark." *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1395 (3d Cir. 1985). Courts often find in trademark infringement cases that the public interest would be favored by the entry of an injunction. *Rocky Mt. Chocolate Factory, Inc. v. SDMS, Inc.*, 2006 U.S. Dist. LEXIS 90103 (D. Colo. Dec. 8, 2006), citing *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 647 F. Supp. 1533, 1545 ("it is in the public interest to enforce the policies of the Lanham Act and to prevent the likelihood of public confusion from becoming an actuality"). Further, federal trademark registrations protect entrepreneurs, who should be able to "rely on a search of the trademark registry and their own knowledge so that substantial expenditures of money promoting the mark will not be wasted." *First Sav. Bank*, 101 F.3d at 651.

Over the past four years, Plaintiff has expended time and money into the due diligence, creation, and protection of the DNVR brand. Plaintiff has built solid and significant trademark rights in the DNVR wordmark and has applied for federal protection of the DNVR Marks and logo. Plaintiff has also established common law rights in the DNVR Sports mark, as early as 2019. Within the previous two weeks, the public has provided evidence that Defendant's newly created DENVER SPORTS wordmark and logo are confusingly similar to Plaintiff's DNVR wordmark,

DNVR logo, and DNVR Sports wordmark. *See* Dkt. No. 3-2, Exhibit J; Pellant Dec., Exhibit AB. Defendant is benefiting from the goodwill that Plaintiff has established in its trademarks, while also causing actual consumer confusion. Here, because public confusion has already become an actuality, there is sound reason to enforce the fundamental policy behind trademark, to ensure consumers are not confused as to the source of its goods and services and to allow companies to benefit from the goodwill and reputations they have built under a brandname. It is in the public interest to enjoin Defendant from using the DENVER SPORTS wordmark and accompanying logo.

## <u>CONCLUSION</u>

**WHEREFORE**, Plaintiff prays for judgment against Defendant as follows:

1.     A judgment granting a preliminary injunction, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, enjoining Defendant, its corporate officers, agents, servants, employees, attorneys and all persons in active concert or participation with them and acting for, with, by, though, or under them, and each of them, from:

a.     using in any form Defendant's confusingly similar mark or any other confusingly similar mark to Plaintiff's registered service mark, or logos and wordmark protected by common law, on or in connection with any part of Defendant's business including all aspects of sports media fan experience services, the advertising, promotion or distribution of any media;

b.     representing directly or indirectly in any form or manner whatsoever, that Defendant's business or products are those of Plaintiff, or are in any manner associated with, sponsored, or approved by Plaintiff or otherwise taking any action likely to cause

confusion, mistake or deception on the part of purchasers as to the source, origin or sponsorship of Defendant's business or services;

       c.      otherwise infringing Plaintiff's DNVR marks or competing unfairly with Plaintiff; and

       d.      surrendering and destroying all infringing materials.

       2.      A judgment ordering Defendant to file with this Court and to serve on Plaintiff within thirty (30) days after the service of the injunction a report in writing under oath, setting forth in detail the manner and form in which Defendant has complied with the foregoing injunction; and

       3.      A judgment ordering such other and further relief as the Court deems appropriate under the circumstances.

                       Respectfully Submitted,

                       STUDIOIP LAW, LLC

Dated: January 19, 2023         */s/ Jessie L. Pellant*
                       Jessie L. Pellant
                       Colorado Attorney Reg. No. 42096
                       jpellant@studioiplaw.com

                       */s/ Timothy M. Sullivan*
                       Timothy M. Sullivan
                       Minnesota Attorney Reg. No. 0391528
                       tsullivan@studioiplaw.com

                       */s/ Larissa M. Goodman*
                       Larissa M. Goodman
                       Colorado Attorney Reg. No. 55222
                       lgoodman@studioiplaw.com

                       3000 Lawrence Street
                       Denver, CO 80205
                       *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of this Motion for Preliminary Injunction and BSN Live, Inc.'s Brief in Support of Motion for Preliminary Injunction has been served on Defendant by email to the attorney's listed below based on written agreement of the parties under Fed. R. Civ. Pro. 5(b)(2)(F).

Ashley I. Kissinger
kissingera@ballardspahr.com

Brian Auerbach
AuerbachB@ballardspahr.com

*/s/ Jessie L. Pellant*
Jessie L. Pellant
*Attorney for Plaintiff*